So we will begin with the first case, Asay v. Johan v. Pinduoduo, and we'll hear from the appellant. Mr. Odo. Good morning, Your Honor. I see you reserve two minutes for rebuttal. One of the definitions of the word strict, according to the Oxford Languages Dictionary, is rigidly enforced. So when the defendant, Pinduoduo, told investors in his prospectus, issued in connection with his initial public offering, that it had adopted strict measures to combat counterfeit products being sold on its platform, that language was intended to give investors comfort that reasonably effective steps were being taken to ensure counterfeit products did not proliferate on the platform. Nothing could have been further from the truth. Why wouldn't that fall into the puffery category? In the case recently of a panel I was on, in resynchrony, and in other cases in the past, we've said those types of vague, positive adjectives are not actionable. Well, strict has a very precise definition, and if they had not included the word strict in this description of the measures they adopted, we might be looking at a different scenario. But by saying strict, they're saying that the measures that they have adopted would be rigidly enforced. So any time a company uses the word strict, we have a strict compliance program, if it's not, if it has issues or defects, that would be actionable? I'm sorry? If a company uses the word strict, we have a strict compliance program, but it turns out there are defects in that program. You're saying it would be actionable because they used the word strict? In this case, yes, because apart from being strict measures, they weren't enforced at all. They weren't rigidly enforced, they weren't being enforced, period, as evidenced by Clinton's allegations concerning proliferation of counterfeit goods on the platform. I would have thought that strict is a somewhat subjective and relative term. I mean, in grammar school, there were teachers that I thought were strict, but others didn't think so, and there were other teachers who were considered more strict or less strict. Why are you so confident that someone hearing strict conjures some very specific image of what's going on? I think that's the case because if you look at some of the other cases where enforcement measures were described in perspectives, it's none of them included the word strict, and by including that, they were attempting to give investors comfort that the measures that they had adopted were being enforced. But the document that you're challenging didn't rest on the adjective strict. I mean, it told investors that we've got a problem here, we're addressing it, and it went on to say that we can give no assurances that it will ultimately be entirely successful. It may result in losses going forward and that sort of thing. So word investors put on notice that this was a continuing problem with this company. But that type of cautionary language doesn't insulate the defendants from liability when the extent of the counterfeit issue on the platform was so widespread. Yes, they did mention that there had been problems in the past, and they did say in the prospectus that all efforts might not be successful in preventing counterfeit products. But I'm used to seeing prospectuses in these lawsuits where the whole thing is filled with glowing descriptions of how great this is all going to be, and then it's like a throwaway warning line. And that's where we say, you know, just saying, yeah, but there could be problems doesn't insulate all the false statements. Here, it seems to me it's the converse of that. The section on possible liability for counterfeiting starts with a paragraph saying, we've been sued, we've been chased by the government, we've had all these problems. Then it says, although, I mean, the thing you're complaining about is a throwaway. It's a concessive clause in a sentence. Although we have these strict measures in place, then it goes on to say, we still can't guarantee anything. And then it goes on for several paragraphs talking about the possible risks and costs that things are going to get discovered to be counterfeit, and then we're going to get sued, and we can get criminal charges, and our reputation can go in the toilet. And it goes on and on and on. And you're focusing on a word in the concessive, yeah, we tried. And they kind of part of the sentence and say, oh, because they said it's strict and you don't think it was strict. And in fairness, you know, maybe a jury would agree that it isn't really strict, that the whole all the rest of the stuff doesn't count. Well, not when they were failing at every level of activating the counterfeit. And what and what happened as a consequence? I mean, it isn't really about, I mean, I don't think that investors are worried particularly about how moral or how strict is this company. They're worried about what are the liability risks. And despite all these warnings, it doesn't seem that anything bad ever happened. Now, I realize that's the benefit of hindsight, but even looking at it prospectively, isn't the real issue here? Did they warn investors that we could suffer significant problems because of the presence of counterfeit goods? Yes, but they were experiencing those problems at the time of the IPO at levels that were certainly not disclosed. Well, they disclosed in the very month of the IPO. They were sued in July 2018. They were sued. The Chinese government had gone after them in January that year. So it was clear that they were not saying this is some problem in the past. They had a problem in the month of the IPO, right? Pretty significant problem that they disclosed. Correct, but even that doesn't explain the extent of the counterfeiting on the platform. And the fact that the measures that they had touted to investors as being protective of that were failing. Skyworth, the company that one of the largest television manufacturers in China, just shortly after the IPO, complained about the breadth of counterfeit televisions on the platform. And within a week after the IPO, it had taken all of its products off the platform. That's one of the repercussions from not having strict enforcement measures actually enforced. Let me ask you a question about the marketing expenses because you have a minute left. The district court found it didn't alter the total mix because the disclosures that they made show that the marketing expenses had grown by a multiplier of 16 over since 2017, averaging a doubling of expenses every quarter, and that the interim financial data that you are pointing to that you believe they should have disclosed was no different really than that. What's your response to that? Well, the big difference is the cost per acquisition of customer, which nearly doubled in that time frame from $8 per customer to $17 per customer. They say you could do the math and calculate the user acquisition costs yourself and see that it quadrupled in the quarter before, in quarter one, right? No, no, the sales and marketing costs did, but not... No, they say if you do the calculations, you divide the number of new users by the increase in expenses, that it shows a quadrupling of user costs in quarter one, you're saying, no? No. Okay. All right. You deserve two minutes for a while. Thank you. All right, Mr. Fumerton. Good morning, your honors. May I please report, Robert Fumerton, for the defendant at that lease. Your honor, the judge has helped correctly dismiss this complaint because plaintiffs failed to collect a single material misstatement or omission. With respect to plaintiff's first theory, and seizing on Judge Lynch's question, I seize on one word, the adjective strict. This court has repeatedly held that adjectives like that do constitute non-actual huffering. In fact, in the JPMorgan Chase case, 553 F3rd at 205 to 206, the court held that the defendant's representations concerning a highly disciplined risk management program for inactual huffering, we would submit there's no meaningful difference between highly disciplined and strict. But moreover, your honor, picking up on Judge Parker's question, the word strict cannot be read in isolation. The rest of the paragraph, the very disclosure on which plaintiff sees at A177 says, quote, although we have adopted strict measures to protect us against potential liabilities, these measures may not always be successful or timely. And as Judge Bianco pointed out, the offering documents further disclose, we have been, we have already been, and may continue to be subject to allegations and lawsuits by putting the products listed or sold through our platform by third party merchants or counterfeits. As Judge Bianco also pointed out, the offering documents went through two recent examples, including January of the very year, seven months before the July IPO, where Chinese regulators said that the company's counterfeiting measures were not strong enough, that they were the strength of them. July 2018, just days before the IPO, the company was subject to private litigation. So this isn't a case where the company says we may be subject to problems. The company says we already are subject to problems with respect to the anti-counterfeiting. Mr. Freminton, let me ask you about the specific measures that are in the offering documents. Sure. They argue that, you know, it's obviously, I understand your point about strict, but there was a list of measures, and they're essentially saying those measures didn't exist. For the fact there's a skeleton crew, there wasn't freezing of accounts, there was just a slap on the wrist when they found somebody. So if that is true, why wouldn't that potentially be actionable? Because, Your Honor, there are no factual allegations demonstrating that the company didn't take each of the measures it disclosed it took on A177. In A177, the company said it proactively verified the authenticity. Plaintiffs admit in paragraph 47 of the amended complaint that the company did hire seven people and looked at hundreds of products a day. Now, they claim that's not adequate enough, that Alibaba looked at more. But, Your Honor, the company made no representations about how many people it had looking at the products. It said it was employing these measures. There's no factual allegations that it did not employ these measures. And in fact, the company disclosed they may not always be successful and they were having existing issues with them. So, Your Honor, this case really stands in stark contrast to the case of Jinko Solar, which is their primary case. There, Jinko Solar disclosed certain anti-pollution efforts. Anti-pollution was at issue in that case. But unlike Kuduodilo, Jinko Solar did not disclose there were any existing problems with those measures. In Jinko Solar, in fact, the company had admitted to regulators there were serious existing problems with its anti-pollution efforts, but made no disclosure whatsoever of that in its offering documents. Here, the company did the opposite. It expressly disclosed there were existing issues with its counterfeiting efforts. It disclosed the company had already been subject to regulatory scrutiny, to private litigation that might continue to do so. Had it not disclosed those existing issues, we might be in a different place. But because we did, Judge Castell correctly concluded that any reasonable investor reading the disclosures as a whole, as you must, would have understood that counterfeiting remained an ongoing problem for the company. It was an ongoing battle. Can you speak to the marketing expense issue that I raised with Mr. Odo? The... He says that the user acquisition cost is the big issue, and that the math, the quadrupling in the quarter of 2018 is not accurate. Can you address that? Sure. The company had no duty to disclose per-unit acquisition costs. That's a made-up metric. The company didn't even disclose that. There are infinite number of ways to slice and dice financial statements, infinite number of metrics that kind of complained, hey, we would have liked this to know. But the data was there. As Judge Castell correctly found, the offering documents expressly disclosed, and this is in A186 and 188, that the company's sales and marketing expenses had, quote, increased substantially. As the Court pointed out, we gave the prior two years sales and marketing expenses, including Q1 2017 and Q1 2018, which showed a 16-fold increase in those marketing expenses. And did you also disclose the number of new customers in each of those years? And the number of new customers. So isn't the ratio of expenses to new customers a simple matter of long division? Simple matter of math that any investor could do. And in fact, if you do the math that plaintiffs do, you see there's no change in the trend of that metric. In fact, in the previous quarter, that metric had quadrupled. In the interim quarter, the plaintiffs complained about it, it only doubled. The company also warned, and this is critical, because this brings us right in line with this Court's decision to bid in solar, that we expect, this is at A175, quote, we expect our operating costs and expenses to increase in absolute amounts in the future due to sales and marketing expenses we continue to expand our buyer base. Except the documents specifically warn, quote, if we continue to incur substantial marketing expenses without being able to achieve the anticipated buyer and merchant growth, our operating results may be material and adversely affected. Again, to judge the sales correctly held, the doubling of marketing expenses, everything in those interim results, was entirely consistent with the trend the company had already disclosed. You have the company warning investors, it expects the marketing expenses to continue, and that if it can't get users to continue at the same rate, it could suffer again. We think the static, you give a solar case, is on all fours for the company. The Court rejected similar allegations that the defendants should disclose interim financial results where the company experienced certain fluctuations, but warned that those fluctuations may occur. I see that I have some time left, but if the Court has no more questions, I can see the board. Thank you. Thank you. Mr. Oto, you have two minutes in rebuttal. So, I think what my senior colleague reiterated about the fact that they were on notice about the counterfeit problem seven months before the IPO with the Chinese government investigation, that was the context for the claim in the prospectus that they had adopted strict measures. So the expectation from the investors was, look, we have these problems, we're trying to deal with them by adopting strict, rigidly enforced measures that will not 100% address the problem, but we're doing our best to do that. That clearly was not the case. They had seven employees, they spot-checked 32,000 out of 3.2 billion transactions in the first six months of 2018. That's one one-thousandth of one percent. Those aren't strict measures. Those aren't any sort of measures. But the investors were told that there's no assurance that these measures will ultimately succeed. You might be exposed to additional regulatory action. We've been sued before. We might be sued again on this. And if we continue to have these counterfeiting problems, it could materially impact our results going forward. And that's why this case is on the long horse with the Meyer case, because the Meyer case said investors are presumed to know that there's not going to be 100% compliance 100% of the time. Regardless of what the cautionary language is saying, they may not be able to do it all the time. They're presumed to know that. But when the measures are actually failing at the time of the IPO, there's an obligation to disclose that. There's a certain way to do that. I mean, just to conjure up a hypothetical, Saks Fifth Avenue says, we have significant problems concerning shoplifting. We've put in strict measures to try to control shoplifting. But going forward, we can give you no assurances that we will not continue to experience losses through shoplifting. I mean, to a certain extent, these disclosures are forward-looking. Well, they are and they aren't. I mean, they are specifically addressing the fact that they're having problems with counterfeiting as evidenced by the Chinese government investigation. And in response to that, they're saying that they're trying to deal with that problem by adopting strict measures. And that clearly was not the case. Thank you. Thank you both. We'll reserve decision. Have a good day.